**WESTCHESTER WOMEN'S HEALTH ORGANIZATION, INC., National Women's Health Organization, Inc., and Toni G. Novick, M.D., Plaintiffs,**

v.

**Robert P. WHALEN, M. D., et al., Defendants.**

**No. 78 Civ. 5082 (HFW).**

United States District Court, S. D. New York.

June 21, 1979.

Roy Lucas, P. C., Washington, D. C., Greenfield & Koppelman, New York City, for plaintiffs; Roy Lucas, Washington, D. C., and Robert Koppelman, New York City, of counsel.

Robert Abrams, Atty. Gen. of the State of New York, New York City, for defendants; Kathleen Gill Miller, Asst. Atty. Gen., New York City, of counsel.

## OPINION

WERKER, District Judge.

This action for injunctive and declaratory relief raises the issue of whether a New York statutory scheme regulating hospitals and other health service facilities can be constitutionally applied to an abortion facility which administers first trimester abortions. This matter is presently before the Court on the parties' cross-motions for summary judgment.[1]

## BACKGROUND

### A. *The Statutory Scheme*

Article 28 of the New York Public Health Law, N.Y.Pub. Health Law § 2800 *et seq.* (McKinney 1977 & Supp. 1978–1979), sets forth a comprehensive plan for the regulation of hospitals and other public and private health service facilities. Section 2801–a of the Public Health Law prohibits

---

**1.** The defendants' present motion for "summary judgment" was originally filed as a motion to dismiss for failure to state a claim upon which relief can be granted. Because matters outside the pleadings were presented, the motion to dismiss was converted to a summary judgment motion pursuant to Fed.R.Civ. P. 56 and the parties were given an opportunity to submit additional materials. In doing so, the plaintiffs cross-moved for summary judgment.

any "hospital" from being established without the written approval of the public health council.[2] "Hospital" is broadly defined to include any "facility or institution engaged principally in providing services by or under the supervision of a physician . . . for the prevention, diagnosis or treatment of human disease, pain, injury, deformity or physical condition . . . ." N.Y.Pub. Health Law § 2801(1) (McKinney Supp. 1978–1979).

Regulation 600.8 of the Department of Health regulations sets forth certain criteria to facilitate differentiating between the individual, private practice of medicine, which is not governed by article 28, and the operation of "a diagnostic or treatment center under article 28 of the Public Health Law." 10 N.Y.C.R.R. § 600.8. Regulation 600.8 was promulgated in response to *People v. Dobbs Ferry Medical Pavillion, Inc.*, 33 N.Y.2d 584, 347 N.Y.S.2d 452, 301 N.E.2d 435 (1973) (mem.), wherein the New York Court of Appeals held that the New York statute and regulations then governing the licensing of enterprises engaged in institutional medical care and treatment were overly broad.

In addition to obtaining written approval from the public health council, a health facility which is found to be a "diagnostic or treatment center" within the meaning of 10 N.Y.C.R.R. § 600.8 must also comply with minimum operating and construction standards set forth in 10 N.Y.C.R.R. §§ 711.7, 750.1–751.16. These standards govern items ranging from laboratory requirements and nursing personnel supervision to the availability of public toilet facilities and the width of public corridors. In addition, certain standards are applicable only to facilities where "terminations of pregnancy are performed." 10 N.Y.C.R.R. §§ 711.7(f)(11), (k)(1)(i), (ii), (xii).

### B. *Facts*

This constitutional challenge to article 28 and the regulations promulgated thereunder was commenced by the Westchester Women's Health Organization, Inc. ("WWHO"), its parent organization, the National Women's Health Organization, Inc. ("NWHO"), and Toni G. Novick, M.D., against the New York State Department of Health and two of its officials.[3] Dr. Novick is a physician licensed in the State of New York who has been performing first trimester abortions at WWHO's office in White Plains, New York since July 1977. WWHO and NWHO furnish Dr. Novick with managerial and administrative support and provide the public with counselling and informational services.

In September 1978, the Department of Health served the plaintiffs with a statement of charges and a notice of hearing, accusing them of violating article 28 of the Public Health Law and regulations promulgated thereunder. The plaintiffs subsequently filed the instant action to seek injunctive and declaratory relief and moved for a preliminary injunction to enjoin the defendants from enforcing article 28. The motion was denied in my memorandum decision of January 30, 1979, on the ground that the plaintiffs had failed to show a threat of irreparable harm.

The Department of Health conducted a hearing in February 1979 to determine whether the plaintiffs were operating a diagnostic or treatment center within the meaning of article 28 and 10 N.Y.C.R.R. § 600.8. On April 4, 1979, in his report to the Department of Health, the hearing officer recommended that the plaintiffs be found to be operating a diagnostic and treatment center. The hearing officer concluded that the plaintiffs were not engaged in the private practice of medicine and recommended that the plaintiffs be directed to comply with the relevant sections of the

---

**2.** With respect to the public health council generally, *see* N.Y. Public Health Law §§ 220–25 (McKinney 1971 & Supp. 1978–1979). *See also* N.Y. Public Health Law §§ 2801–a, 2803 (McKinney 1977 & Supp. 1978–1979).

**3.** The two officials are Robert P. Whalen, M.D., Commissioner of Health of the State of New York, and Richard A. Berman, Director of the Office of Health Systems Management.

Public Health Law and the regulations promulgated thereunder.

At this juncture, the parties are in agreement that no genuine issues of material fact exist to be tried. Accordingly, they have cross-moved for summary judgment. The plaintiffs maintain that article 28 cannot be constitutionally applied to an abortion facility which only administers first trimester abortions and that consequently the defendants' actions constitute a violation of the fourteenth amendment. In contending that summary judgment should be granted in their favor, the defendants argue that this Court should refrain from interfering with the pending state administrative proceeding under principles of comity and abstention, and further, that there is no constitutional right to operate a first trimester abortion facility free from the incidental impact of state health regulations applicable to health facilities in general. In addition, the defendants allege that WWHO and NWHO lack standing to raise claims based on the right to privacy of pregnant women.

## DISCUSSION

### A. *Standing*

The defendants' contention that WWHO and NWHO do not have standing to assert the privacy rights of pregnant women need not detain the Court, for it is clear that Dr. Novick has standing to litigate this lawsuit on her own behalf as well as on behalf of her patients.

■ There can be no doubt that Dr. Novick will suffer "concrete injury" from the application of the New York statutory scheme to the plaintiffs' abortion facility. Dr. Novick was named a respondent, along with WWHO and NWHO, in the Department of Health proceeding. An initial determination has been made that the facility is indeed a "diagnostic or treatment center." If this determination is upheld, and if it should be determined that violations of the regulations exist, then Dr. Novick may be subject to civil penalties. Additionally, Dr. Novick may be required to expend funds to remodel the White Plains office to bring it into compliance with the regulations, and if the facility should be ultimately closed down, which is a possibility under the statute, Dr. Novick would be deprived of certain income as well as the administrative and managerial support of WWHO and NWHO. Thus, it is clear Dr. Novick faces a "direct threat of personal detriment." *Doe v. Bolton*, 410 U.S. 179, 188, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973).

■ Dr. Novick's standing to assert the rights of her patients is established by *Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). In that case, a plurality of the Supreme Court held that a physician has standing to assert the right of his or her patients to be free from governmental interference with the abortion decision. 428 U.S. at 113–18, 96 S.Ct. 2868. *Accord, Friendship Medical Center, Ltd. v. Chicago Board of Health*, 505 F.2d 1141, 1147–48 (7th Cir. 1974), *cert. denied*, 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 (1975); *West Side Women's Services, Inc. v. City of Cleveland*, 450 F.Supp. 796, 798 (N.D.Ohio), *aff'd mem.*, 582 F.2d 1281 (6th Cir.), *cert. denied*, 439 U.S. 983, 99 S.Ct. 572, 58 L.Ed.2d 654 (1978); *Wynn v. Scott*, 449 F.Supp. 1302, 1309 (N.D.Ill.) (three-judge court), *appeal dismissed on jurisdictional grounds*, 439 U.S. 8, 99 S.Ct. 49, 58 L.Ed.2d 7 (1978). *See also Craig v. Boren*, 429 U.S. 190, 192–97, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (beer vendor has *jus tertii* standing to challenge state statute on equal protection grounds). Since the issues are sufficiently and adequately presented by Dr. Novick, the question of the standing of WWHO and NWHO need not be reached. *Planned Parenthood v. Danforth*, 428 U.S. 52, 62–63 & n. 2, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976); *Doe v. Bolton*, 410 U.S. 179, 189, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973).

### B. *Abstention*

The defendants contend that the principles of federal nonintervention articulated in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct.

746, 27 L.Ed.2d 669 (1971), and its progeny[4] preclude this Court from interfering with the pending state administrative proceeding.[5] There is some question in my mind as to whether the Department of Health proceeding at issue is the type of state criminal, quasi-criminal or civil enforcement proceeding contemplated by the *Younger* abstention doctrine, for the Supreme Court has not extended *Younger* to all civil litigation. *Trainor v. Hernandez,* 431 U.S. at 445 n. 8, 97 S.Ct. 1911. Even assuming the Department of Health proceeding is the type of state proceeding that falls within the ambit of the *Younger* doctrine, I nevertheless conclude that I should not abstain from reaching the merits.

■ There are no issues of state law involved herein. While a state statutory scheme is being challenged, the sole claim raised by the plaintiffs is that article 28 of the New York Public Health Law cannot be applied to first trimester abortion facilities without violating federal rights arising under the U.S. Constitution. This claim is not yet before the state courts; there is no state judicial action pending. The state administrative proceeding is still in its initial stages and has not progressed beyond the filing of a report and recommendations by a hearing officer. The administrative proceeding has not dealt with the constitutional issues raised herein, and, in any event, the Department of Health is certainly not the proper forum for the airing of constitutional claims.

On the other hand, the instant action is at a stage where it is ripe for resolution on the merits. The parties have conducted discovery and cross-motions for summary judgment have been filed. The parties agree that no issues of fact remain to be tried.

The *Younger* abstention doctrine is founded on considerations of equity, comity and federalism which require the federal courts to refrain from "unduly interfer[ing] with the legitimate activities of the States." 401 U.S. at 44, 91 S.Ct. at 750–751. Abstention should not be invoked simply to give the state courts the first opportunity to hear a federal claim. *Boe v. Colello,* 438 F.Supp. 145, 151–52 (S.D.N.Y.1977), *citing McNeese v. Board of Education,* 373 U.S. 668, 672, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963). *See also Trainor v. Hernandez,* 431 U.S. at 448–49, 97 S.Ct. 1911 (Blackmun, J., concurring) (*Younger* abstention doctrine requires a balancing of state and federal interests).

In the case at bar, no purpose would be served by dismissing or staying the action on abstention grounds. The plaintiffs have not yet had an opportunity to present their federal claims, which are based on alleged violations of fundamental rights guaranteed by the U.S. Constitution, in the state proceeding. *Judice v. Vail,* 430 U.S. at 337, 97 S.Ct. 1211. Hence, reaching the merits would not result in duplication of judicial effort, nor would it reflect negatively on the ability of the state courts to hear constitutional claims. *Huffman v. Pursue,* 420 U.S. at 604, 95 S.Ct. 1200. Requiring the plaintiffs to file a new action in state court, on the other hand, would certainly be duplicitous and inefficient.[6] The defendants' request for abstention is denied.

---

4. *Trainor v. Hernandez,* 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977); *Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977); *Huffman v. Pursue,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975). *See generally Constitutional Law—Supreme Court Extends Younger Doctrine,* 46 Fordham L.Rev. 176 (1977).

5. The defendants have not sought to invoke the abstention doctrine enunciated in *Railroad Comm'n v. Pullman Co.,* 312 U.S. 496, 499–501, 61 S.Ct. 643, 85 L.Ed. 971 (1941), nor could they. *Pullman* abstention requires a federal court to refrain from resolving a constitutional issue raised by an unclear or complex state statute until the state courts have had an opportunity to interpret the statute. In the instant case, article 28 of the New York Public Health Law and the Department of Health regulations are neither unclear nor complex. *See Pharmaceutical Soc'y of the State of New York, Inc. v. Lefkowitz,* 586 F.2d 953, 955–57 (2d Cir.1978).

6. Conceivably, the plaintiffs may be able to assert their constitutional claims further up the line in the enforcement proceeding, for example, if and when the state commences an action in state court to enjoin violations or threatened

## C.  *The Merits*

In the landmark case of *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Supreme Court held that a woman's fundamental right to privacy encompassed the right to terminate her pregnancy if she so desired.  The Court reached this result by balancing a woman's right to privacy against a state's interest in protecting the health of pregnant women and the potentiality of human life.  410 U.S. at 152–54, 162–64, 93 S.Ct. 705.  Despite some broadly drafted language in the opinion to the effect that the states may not regulate first trimester abortions at all,[7] the Court made it clear that a woman's right to have an abortion is "not absolute," 410 U.S. at 155, 93 S.Ct. 705, that this right must be weighed against the state's "important and legitimate interest in preserving and protecting the health of the pregnant woman . . . ."  410 U.S. at 162, 93 S.Ct. at 731.

■ Cases decided after *Roe v. Wade* have erased any doubts as to the ability of the states to regulate, under certain circumstances, first trimester abortions.  While the state's interest in maternal health is more compelling in the later stages of pregnancy, this interest must be considered even during the first trimester.  The Supreme Court's decision in *Roe' v. Wade* was based partially on a finding that first trimester abortions are as safe for a woman as normal childbirth.  410 U.S. at 149–50, 163, 93 S.Ct. 705.  Recognizing that this "predicate holds true only if the abortion is performed by medically competent personnel under conditions insuring maximum safety for the woman," the Court in *Connecticut v. Menillo*, 423 U.S. 9, 11, 96 S.Ct. 170, 171, 46 L.Ed.2d 152 (1975), upheld a state requirement that *all* abortions be performed by licensed physicians.  Even as to the first trimester of abortion, then, the state has the power—and responsibility—to ensure that abortions are performed with due regard for the health and safety of the patient.  *Roe v. Wade*, 410 U.S. at 149–50, 93 S.Ct. 705; *Hodgson v. Lawson*, 542 F.2d 1350, 1357 (8th Cir. 1976).[8]

■ The state's interest in maternal health must be considered in conjunction with the nature and extent of the interference with a woman's right to privacy caused by the regulation of abortions.  *Maher v. Roe*, 432 U.S. 464, 473, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977); *Bellotti v.*

---

violations of article 28.  *See* N.Y. Public Health Law § 2801–c (1977).  However, the delay and uncertainty which would be involved militate against abstaining.

7.  For example, the Court in *Roe v. Wade* concluded:

> [F]rom and after [the end of the first trimester], a State may regulate the abortion procedure to the extent that the regulation reasonably relates to the preservation and protection of maternal health.  Examples of permissible state regulation in this area are requirements as to the qualifications of the person who is to perform the abortion; as to the licensure of that person; as to the facility in which the procedure is to be performed, that is, whether it must be a hospital or may be a clinic or some other place of less-than-hospital status; as to the licensing of the facility; and the like.
>
> This means  .  .  .  that, for the period of pregnancy prior to this "compelling" point, the attending physician, in consultation with his patient, is free to determine, without regulation by the State, that, in his medical judgment, the patient's pregnancy should be terminated.  If that decision is reached, the judgment may be effectuated by an abortion free of interference by the State.  410 U.S. at 163, 93 S.Ct. at 732.  It is apparent that this language is not to be construed literally.  The Supreme Court itself, for example, has permitted state regulation of "the qualifications of the person who is to perform the abortion," even as to first trimester abortions, despite the fact that this type of regulation would appear to be precluded by the above-quoted passage from *Roe*.  *Connecticut v. Menillo*, 423 U.S. 9, 96 S.Ct. 170, 46 L.Ed.2d 152 (1975).  *See Sendak v. Arnold*, 429 U.S. 968, 970, 972 n., 97 S.Ct. 476, 477, 50 L.Ed.2d 579 (1976) (White, J., dissenting).

8.  The Court in *Roe* observed:

> The State has a legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient.  This interest obviously extends at least to the performing physician and his staff, to the facilities involved, to the availability of aftercare, and to adequate provision for any complication or emergency that might arise.  410 U.S. at 150, 93 S.Ct. at 725.

*Baird,* 428 U.S. 132, 149–50, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976). It would appear that a statute or regulation is unconstitutional only if it interferes with the abortion *decision,* and not merely with the abortion *process. See Roe v. Wade,* 410 U.S. at 153, 93 S.Ct. at 727. ("This right of privacy . . . is broad enough to encompass a woman's *decision* whether or not to terminate her pregnancy. The detriment that the State would impose upon the pregnant woman by denying this *choice* altogether is apparent.") (emphasis added).[9] Moreover, the interference with a woman's freedom to decide whether to terminate her pregnancy is unconstitutional only if it is "unduly burdensome." *Maher v. Roe,* 432 U.S. at 473–74, 97 S.Ct. 2376. *See also Bellotti v. Baird,* 428 U.S. at 147, 96 S.Ct. at 2866. (A requirement for a lawful abortion is constitutional "unless it unduly burdens the right to seek an abortion."). Hence, while written patient consent and reporting and record keeping requirements certainly affect the abortion process, they do not unduly intrude upon a woman's right to choose to have an abortion. Consequently, such requirements have been sustained. *Planned Parenthood v. Danforth,* 428 U.S. at 65–67, 79–81, 96

S.Ct. 2831 (1976). On the other hand, a requirement of written consent to an abortion from a pregnant woman's spouse is unconstitutional, for such a requirement, by delegating the power to veto an abortion to the husband, unduly interferes with the woman's right to have an abortion if she so chooses. *Id.* at 67–72, 96 S.Ct. 2831.

■ The application of article 28 of the New York Public Health Law to first trimester abortion facilities does not in my opinion constitute undue interference with a woman's freedom to decide whether to have an abortion.[10] The application of article 28 to diagnostic or treatment centers which administer first trimester abortions would place "no obstacles—absolute or otherwise—in the pregnant woman's path to an abortion." *Maher v. Roe,* 432 U.S. at 474, 97 S.Ct. at 2382. Abortions could still be performed at approved abortion facilities and hospitals as well as the individual offices of physicians,[11] for the statutory requirement that abortions be performed on an in-patient basis in a hospital applies only to abortions administered after the first trimester. N.Y. Public Health Law § 4164(1) (McKinney 1977).[12] Thus, while

**9.** *But see Friendship Medical Center, Ltd. v. Chicago Bd. of Health,* 505 F.2d 1141, 1151 (7th Cir. 1974), *cert. denied,* 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 (1975). Admittedly regulations governing the process of obtaining an abortion will affect a woman's decision whether or not to have an abortion. The issue is whether the state's interference with the effectuation of an abortion is so unduly burdensome as to limit a woman's freedom to choose to have an abortion.

**10.** *Accord, West Side Women's Servs., Inc. v. City of Cleveland,* 450 F.Supp. 796 (N.D.Ohio), *aff'd mem.,* 582 F.2d 1281 (6th Cir.), *cert. denied,* 439 U.S. 983, 99 S.Ct. 572, 58 L.Ed.2d 654 (1978) (city ordinance prohibiting operation of abortion clinics in local retail business districts held constitutional); *Abortion Coalition of Michigan, Inc. v. Michigan Dep't of Pub. Health,* 426 F.Supp. 471 (E.D.Mich.1977), *enforcement enjoined to permit state court opportunity to interpret state statute,* No. 77–1223 (6th Cir. 1978) (statute providing for licensing and regulation of free-standing surgical out-patient facilities may be constitutionally applied to first trimester abortion facilities). *Contra, Baird v. Department of Pub. Health,* No. 73–3869 MA (D.Mass. Oct. 5, 1978) (application of

general clinic licensing statute to first trimester abortion facilities is unconstitutional); *Indiana Hosp. Licensing Council v. Women's Pavilion of South Bend, Inc.,* No. K–1521 (Ind.Cir.Ct. Mar. 26, 1979) (application of general ambulatory outpatient surgical center licensing statute to first trimester abortion facilities is unconstitutional). *Cf. Fox Valley Reproductive Health Care Center, Inc. v. Arft,* 446 F.Supp. 1072 (E.D.Wis.1978) (on motion for preliminary injunction, held, reasonable likelihood that town ordinance regulating abortion clinics is unconstitutional).

**11.** For this reason, the plaintiffs' reliance on *Arnold v. Sendak,* 416 F.Supp. 22 (S.D.Ind.) (three-judge court), *aff'd mem.,* 429 U.S. 968, 97 S.Ct. 476, 50 L.Ed.2d 579 (1976), is misplaced, for the Indiana statute at issue in that case required all abortions, including those during the first trimester, to be performed in a hospital or licensed health facility.

**12.** Abortions performed by licensed physicians within the first 24 weeks of pregnancy have been permitted in New York since 1970. *See* 1970 N.Y.Laws ch. 127, *codified in* N.Y. Penal Law § 125.05(3) (McKinney 1975).

applying article 28 to abortion facilities would certainly interfere with the process of obtaining an abortion, a woman's freedom to decide whether or not to terminate her pregnancy would not be intruded upon. The fact that an abortion clinic must conform to minimum health and safety standards would not in any way coerce a woman into not having an abortion; indeed, the opposite effect would probably result in that a woman would be assured that certain health and safety standards had been met. While the application of article 28 to abortion facilities may have the effect of increasing the cost of an abortion at such a facility, such an effect does not constitute undue interference with the abortion decision. *See Maher v. Roe*, 432 U.S. at 474, 97 S.Ct. 2376 (state regulation limiting medicaid benefits for first trimester abortions to those that are "medically necessary" is constitutional even though financial difficulties suffered by an indigent woman seeking an abortion are continued); *Woe v. Califano*, 460 F.Supp. 234 (S.D.Ohio 1978).

It cannot be disputed that the State of New York has a substantial interest in regulating hospitals and other diagnostic or treatment centers. *See* N.Y. Public Health Law § 2800 (McKinney 1977). Health clinics and diagnostic or treatment centers are often managed or controlled by nonmedical personnel who are not governed by the same licensing and ethical requirements as are doctors. Thus, the potential for abuse does exist. *See* reply affid. of Michael McGarvey, M.D., sworn to Dec. 13, 1978, at ¶ 4. The plaintiffs contend that the state's interest in the safe operation of abortion facilities is adequately protected by the re-

quirement that abortions be performed by licensed physicians. This contention is unconvincing, for the state's control over a licensed physician does not directly extend to the nonmedical management staff in control of an abortion clinic. Moreover, a diagnostic or treatment center can continue to function even though the license of its physician has been suspended or revoked, since the center can simply retain another doctor. *See* plaintiffs' response to defendants' request no. 10 for admissions.

While there is no evidence of abuse or less than high quality medical care at the plaintiffs' abortion facility, its organizational structure demonstrates the extent to which nonmedical personnel influence the operations of a diagnostic or treatment center. WWHO manages the White Plains abortion facility; it handles all finances, including the payment of salaries to all employees; it hires the nonmedical staff and participates in the hiring of the medical staff; it has access to all medical records; and it generally makes initial contact with prospective patients. Report of Hearing Officer Jonathan M. Brandes, Dep't of Health, ¶¶ 20, 21, 24, 26, 31 (April 1979). In addition, the equipment at the facility is owned by WWHO, and the premises are leased in WWHO's name. Plaintiffs' responses to defendants interrogatories 18, 24.

The operating standards imposed by article 28 and the Department of Health regulations[13] are basic in nature. McGarvey reply affid., at ¶ 8. For example, the regulations require that anesthetics be administered by qualified personnel, that respiratory equipment for resuscitation be available,

---

**13.** 10 N.Y.C.R.R. pts. 400, 401 are applicable to all facilities governed by article 28 of the Public Health Law. 10 N.Y.C.R.R. § 711.7 sets forth general structural, equipment and safety standards for existing diagnostic or treatment centers, while 10 N.Y.C.R.R. pt. 715 sets forth construction standards for new diagnostic or treatment centers. Operating standards for treatment or diagnostic centers are contained in 10 N.Y.C.R.R. pts. 750–54.

10 N.Y.C.R.R. § 400.9 provides that all facilities governed by article 28 are to have a written transfer agreement with an appropriate back-up medical facility "located in or near the same

community." While plaintiffs correctly point out that similar requirements have been struck down, *see, e. g., Friendship Medical Center, Ltd. v. Chicago Bd. of Health*, 505 F.2d 1141 (7th Cir.), *cert. denied*, 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 (1974); *Word v. Poelker*, 495 F.2d 1349 (8th Cir. 1974), all of the cases relied on by plaintiffs in this respect are distinguishable in that they involved statutes directed specifically at abortion facilities and which required the back-up facility to be located no more than 15 (or fewer) minutes away. The New York regulation applies to health facilities generally and is far less restrictive.

and that nursing personnel be supervised by registered professional nurses. 10 N.Y.C. R.R. §§ 751.5, .9, .15. These standards apply to all diagnostic or treatment centers; they would undoubtedly apply to a facility that specialized in prenatal care leading up to childbirth. As of April 10, 1979, there were 337 licensed diagnostic or treatment centers in New York State, 19 of which performed abortional procedures. Defendants' responses to plaintiffs' interrogatories 1, 2.

■ The regulations setting forth construction standards specifically governing diagnostic or treatment centers that perform abortions must be addressed separately. While not all regulations distinguishing abortion procedures from other medical procedures are unconstitutional, *Bellotti v. Baird*, 428 U.S. at 149–50, 96 S.Ct. 2857, "difference[s] in treatment must be shown to be necessitated by the particular characteristics of the abortion procedure." *Hodgson v. Lawson*, 542 F.2d at 1358. *See also Word v. Poelker*, 495 F.2d 1349, 1352 (8th Cir. 1974); *Women's Medical Center v. Cannon*, 463 F.Supp. 531, 536–37 (D.R.I.1978).

The New York regulations single out abortion facilities in several respects. Regulation 711.7(f)(11) provides:

If procedures for terminations of pregnancy are performed, the facility shall also have:

(i) procedure rooms with a minimum dimension of 12 feet by 15 feet;

(ii) scrub-up facilities adjacent to the procedure rooms;

(iii) separate male and female locker and dressing rooms, and toilet rooms;

(iv) recovery room consisting of two recovery beds for each procedure room, and a lounge with sitting space for four patients for each procedure room;

(v) stretcher parking area or alcove;

(vi) patient dressing and toilet facilities;

(vii) storage space for oxygen and inhalation equipment, in accordance with National Fire Protection Association Code 56B, Standard for Nonflammable Medical Gas Systems.

Regulation 711.7(k)(1) provides in part:

(i) Minimum widths of public corridors shall be four feet[;] in facilities where terminations of pregnancy are performed, these corridors shall be five feet.

(ii) Minimum widths of doors for patient access to examination, consultation and treatment rooms shall be two feet six inches. In facilities where terminations of pregnancy are performed, these doors shall be three feet two inches.

(xii) in facilities where procedures for termination of pregnancy are performed, the arrangement of corridor doors, elevators and other passages shall be adequate to allow a stretcher-born patient to be moved from each procedure room and recovery room to a street level exit.

■ An explanation for this disparate treatment of abortion facilities is provided by Dr. Michael McGarvey, the deputy director of the Division of Health Facilities Standards and Controls, Office of Health Systems Management, New York State Department of Health. In his affidavit of Dec. 13, 1978, he states that separate procedure rooms, scrub-up facilities, doctors' and nurses' dressing rooms, and patient dressing and toilet facilities are required because "[a]bortions, even during the first trimester, are surgical procedures which require that aseptic conditions be maintained." Because anesthesia is used during the operation, a separate recovery room is necessary. Since more time is generally required for recovery than for the operation itself, and since abortions at such facilities are often performed in succession, two recovery beds are necessary for each procedure room. A procedure room must be at least 12 by 15 feet large in order to accommodate the necessary equipment and personnel. The regulations governing the width of corridors and doors and the arrangement of elevators, doors and passages are designed

to facilitate the transporting of patients on stretchers, which is often required because of the use of anesthesia and the occasional occurrence of bleeding during and after the operation.[14]  McGarvey reply affid., at ¶ 11. On the basis of these undisputed medical facts, I conclude that the defendants have demonstrated that the differences in the treatment of abortion facilities are necessitated by the nature of the abortion operation.[15]

## CONCLUSION

In accordance with the above, I hold that article 28 of the New York Public Health Law and the regulations promulgated thereunder can be constitutionally applied to an abortion facility which administers first trimester abortions.  The plaintiffs' motion for summary judgment is denied. The defendants' motion for summary judgment is granted and the complaint is hereby dismissed in all respects.  The defendants are directed to submit a judgment within ten days after entry of this decision.

SO ORDERED.

---

**14.**  It should be noted that the regulations provide for a certain amount of flexibility: "With respect to facilities such as . . . diagnostic and treatment centers . . . and other independent out-of-hospital medical facilities, the commissioner may determine, on the basis of the approved program, that full compliance with the construction standards of this Part is not essential for the protection of the health and safety of the occupants." 10 N.Y.C.R.R. § 711.7(d)(5). Hence, the plaintiffs may seek exemption from any particular regulation which may not be necessary to the safe operation of their facility.  *See* defendants response to plaintiffs' interrogatory 14.

**15.**  *Compare Women's Medical Center of Providence, Inc. v. Cannon,* 463 F.Supp. 531 (D.R.I. 1978) (regulation requiring doctors who perform abortions to have unsupervised privileges in licensed hospital; held, since there is no valid rationale for imposing such a requirement on abortion procedures and not on other surgical procedures, the regulation is unconstitutional).