WOMEN'S MEDICAL CENTER OF PROVIDENCE, INC.

v.

Dennis J. ROBERTS, II, et al.

PLANNED PARENTHOOD OF RHODE ISLAND, et al.

v.

Dennis J. ROBERTS, II, et al.

Civ. A. Nos. 80–292, 80–334.

United States District Court, D. Rhode Island.

April 21, 1981.

Deming Sherman, Edwards & Angell, Providence, R. I., Lynette Labinger, Providence, R. I., for plaintiff.

John Foley, Dept. of Atty. Gen.,—R. I., Providence, R. I., Joseph Palumbo, Newport, R. I., Mary Ellen McCabe, R. I. Dept. of Health, Providence, R. I., for defendants.

## MEMORANDUM AND ORDER

PETTINE, Chief Judge.

Plaintiffs brought this action under 42 U.S.C. § 1983.[1] This Court's jurisdiction stems from 28 U.S.C. § 1331(a), 1343(3), 2201, and 2202. Plaintiffs seek an injunction[2] preventing the enforcement of Rhode Island General Laws Chapter 23–4.7, entitled "Informed Consent for Abortion", and a declaration that Chapter 23–4.7 violates certain provisions of the United States Constitution.[3] Women's Medical Center and Planned Parenthood have sued as entities.

1. Originally, the Rhode Island statute was challenged in two separate actions: C.A. No. 80–0292 and C.A. No. 80–0334. Upon motion to consolidate, the two actions were combined on July 9, 1980.

2. In seeking to prevent the enforcement of Chapter 23–4.7 of the General Laws of Rhode Island, plaintiff Women's Medical Center sought an order from this Court specifically enjoining such enforcement. Defendants agreed to the entry of such an order and, on July 3, 1980, it was entered by the Court. This order remains in effect today and will continued in effect pending a trial on the merits.

3. Chapter 23–4.7 provides as follows:

23–4.7–1. Time of consent.—An abortion permitted by law shall be performed only with the informed written consent of the woman given freely and without coercion not more than seven (7) days but at least twenty-four (24) hours prior to the scheduled operation. In the event the scheduled operation is delayed for good medical cause, then the twenty-four (24) hour requirement shall not apply if the informed written consent has been previously complied with in the same seven (7) day time period prior to the scheduled operation.

The prescribed waiting period may be waived where there is an emergency requiring immediate action. The attending physician shall certify in writing the patient's medical record as to the emergency and the medical basis for his opinion.

Simple compliance with the time requirements of this section shall not be prima facie evidence of informed consent.

23–4.7–2. Required disclosure.—In order to insure that the consent of the pregnant woman is truly informed consent, an abortion shall be performed only after the woman has

They challenge the Rhode Island statute insofar as it infringes on their right to provide abortion services. In addition, these institutional plaintiffs contend that they have *jus tertii* standing to challenge the statute because it infringes on the constitutional rights of women who seek legal abortions at the facilities. The individual doctors, on behalf of themselves and the class of doctors they represent, have challenged the statute on grounds that it violates their right to provide abortions and on grounds that it violates the rights of women seeking legal abortions. Defendants, in a motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure, have moved to dismiss plaintiffs Women's Medical Center and Planned Parenthood of Rhode Island (the institutional plaintiffs), from the action. Defendants contend, first, that these particular plaintiffs lack standing to challenge Chapter 23–4.7. Alternatively, defendants assert that even if plaintiffs have established sufficient injury-in-fact to satisfy the requisites of Article III of the Constitution, they may not assert *jus tertii* standing to raise the constitutional rights of their patients—women who seek to obtain legal abortions at their facilities. For the reasons that follow, I must reject defendants' arguments and deny their Motions to Dismiss.

signed a consent form acknowledging that she has been informed by the physician who is to perform the abortion as follows:

(1) That she is pregnant and a copy of her pregnancy test is available to her.

(2) That the nature of an abortion has been fully explained, including the probable gestational age of the fetus at the time the abortion is to be performed.

(3) That the medical or surgical procedure to be used has been explained, to include all medical risks, both physical and psychological, associated with the particular abortion procedure to be employed, consistent with good medical practice.

(4) That the printed information prescribed in § 23–4.7–4 is available, if in fact it has been made available by the department of health.

(5) That the woman be informed of all medical risks, both physical and psychological, to herself and the fetus, associated with the alternative of carrying the fetus to term, consistent with good medical practice.

In addition, the physician may inform the woman of any other material facts or opinions or provide any explanation of the above information, which in the exercise of his best medical judgment, is reasonably necessary to allow the woman to give her informed consent to the proposed abortion, with full knowledge of its nature and consequences. In cases where the woman does not understand English, either the consent form shall be written in a language understood by her, or the physician informing her shall certify on the consent form that in his or her opinion, the information required in this section has been given in such a manner as to be understandable by her; if an interpreter is used, the interpreter shall be named and reference to such use shall be made on the consent form.

23–4.7–3. Consent form requirements.—Duties of physician.—The consent form shall comply with the requirements of § 23–4.7–2. A copy shall be made available to her upon her request.

23–4.7–4. Printed information.—The department of health shall, within sixty (60) days after this section becomes law, cause to be published printed materials that may be easily comprehended in all languages used by significant portions of the population of this state:

(1) Materials designed to inform concerned persons of public and private agencies and services available to assist a woman through pregnancy, upon childbirth and while the child is dependent, including a comprehensive list of the agencies available and a description of the manner in which they might be contacted; and

(2) Materials designed to inform concerned persons of the probable anatomical and physiological characteristics of the fetus at the various gestational ages at which abortion might be performed, including any relevant information on the possibility of fetal survival.

23–4.7–5. Liability of physician.—A physician who intentionally, knowingly or recklessly violates the requirements of § 23–4.7–2 shall be fined not more than five hundred dollars ($500), or imprisoned for not more than one (1) year, or both. Failure to provide the woman with the substance of the information pursuant to the requirements of § 23–4.7–2 shall be prima facie evidence of failure to obtain informed consent in an action at law, or in equity.

23–4.7–6. Severability.—If any section or provision of this chapter or the application thereof is held invalid, such invalidity shall not affect other sections, provisions or applications, and to this end the sections and provisions of this chapter are hereby declared severable.

## DISCUSSION

### A. *Necessity of Reaching the Issue*

 Initially, I note that authority exists to the effect that if one plaintiff in an action has standing, a court need not reach the issue of the standing of other plaintiffs. *See Carey v. Population Services International*, 431 U.S. 678, 682, 97 S.Ct. 2010, 2014, 52 L.Ed.2d 675 (1977); *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 263–64 & n.9, 97 S.Ct. 555, 562 n.9, 50 L.Ed.2d 450 (1977); *Planned Parenthood v. Danforth*, 428 U.S. 52, 62–63 & n.2, 96 S.Ct. 2831, n.2, 49 L.Ed.2d 788 (1976); *Doe v. Bolton*, 410 U.S. 179, 189, 93 S.Ct. 739, 746, 35 L.Ed.2d 201 (1973); *Westchester Women's Health Organization v. Whalen*, 475 F.Supp. 734, 737 (S.D.N.Y.1979). The rationale for this approach is that, where one plaintiff has standing, the merits will necessarily be raised and decided in the litigation. Consequently, "nothing is gained or lost by the presence or absence of" other plaintiffs. *Doe v. Bolton*, 410 U.S. at 189, 93 S.Ct. at 746. Hence, when one party with standing presents a justiciable claim, courts will—when it makes no difference to the merits of the case—avoid deciding elusive and difficult questions of standing. This approach serves the general principle that, where possible, a decision on a constitutional question should be avoided. *See, e. g., Rescue Army v. Municipal Court*, 331 U.S. 549, 568–75, 67 S.Ct. 1409, 1419–23, 91 L.Ed. 1666 (1947); *Ashwander v. TVA*, 297 U.S. 288, 346–48, 56 S.Ct. 466, 482–83, 80 L.Ed. 688 (Brandeis, J., concurring).

In the case at hand, the challenge to Chapter 23–4.7 was initiated by the institutional plaintiffs, certain named physicians, and the class of doctors these physicians represent. Defendants contest only the standing of the institutional plaintiffs, they have not questioned the standing of plaintiff individual doctors or the class they represent. Indeed, any such challenge would likely be unavailing. *See Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972). Arguably, therefore, under Supreme Court precedent, this Court could avoid deciding the standing issues presented in defendants' motions to dismiss. Superficially, it looks as if "nothing [will be] gained or lost by the presence or absence of" the institutional plaintiffs in this case. A closer look, however, reveals a good and important reason to reach and decide these issues.

Certainly, for purposes of deciding the constitutionality of the challenged Rhode Island statute, it makes little difference who presents the issues to the Court. However, if plaintiffs prevail in their action, Rhode Island probably will be liable for attorney's fees under 42 U.S.C. § 1988.[4] As

---

4. In relevant part, 42 U.S.C. § 1988 provides: In any action or proceeding to enforce a provision of section [ ] . . . 1983 . . . of this title, . . . the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of costs.

In arriving at a "reasonable" fee, the Court considers various factors, including 1) the time and labor required; 2) the novelty and difficulty of the question presented; 3) the skill required to perform the legal services; 4) the preclusion of other employment by the attorney due to acceptance of the case; 5) the customary fee in the community; 6) whether the fee is fixed or contingent; 7) time limitations imposed by client or circumstances; 8) the amount involved and the results obtained; 9) the experience, reputation and ability of the attorney; 10) the undesirability of the case; 11) the nature and length of the professional relationship with the client; and 12) awards in similar cases. *King v. Greenblatt*, 560 F.2d 1024, 1026–27 (1st Cir. 1977) *citing Johnson v.*

*Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). *But see Furtado v. Bishop*, 635 F.2d 915 (1st Cir. 1980) (expressing disapproval of *King* factors and favoring "lodestar" approach).

I have found no case which discusses the effect of the availability of attorney's fees on the question whether to reach standing issues as to each of numerous plaintiffs when one plaintiff clearly possesses the requisite standing. It appears to me, however, that the potential availability of fees virtually mandates that a court decide at the outset whether all of the plaintiffs in a case are properly before the Court, and, if they are, which issues they have standing to raise. To wait until a fee request is actually made, and then resolve, for example, whether a party's assertion of *jus tertii* standing should have been allowed, would seem manifestly unreasonable.

The approach that I take today comports with the general observations of the First Circuit in

a result, the number of parties present and the issues each is allowed to litigate could have a direct and real bearing on the State's ultimate liability in this action. If the institutional plaintiffs lack standing in the sense that they cannot establish injury-in-fact, they will be dismissed from the action and even if the remaining plaintiffs prevail on the merits, the State will not be liable for attorney's fees attributable to the actions by the medical facilities. If the institutional plaintiffs establish standing in their own right but are not allowed to raise *jus tertii*, the constitutional rights of their patients, the state's potential liability for fees to the facilities will include only those fees attributable to arguments concerning the specific constitutional rights of the institutional plaintiffs. Finally, if the institutional plaintiffs possess standing and if, as a prudential matter, they are permitted to raise and litigate the rights of their women patients, the state could be liable for the fees of all plaintiffs in the action, including fees attributable to arguments advanced in behalf of women not technically parties to the action. As I perceive it, the potential availability of attorney's fees turns the standing question raised by defendants' motions to dismiss into a situation in which a great deal "may be gained or lost [depending upon] the presence or absence of" multiple plaintiffs. Because of its importance to the State's potential liability for attorney's fees, I will therefore reach and decide the question whether the institutional plaintiffs have standing and, if they do, whether they may assert, *jus tertii*, the rights of women patients who seek abortions during the first trimester of their pregnancies.

the case of *White v. New Hampshire Department of Employment Security*, 629 F.2d 697, 704 (1st Cir. 1980), in which the Court stated:
A request for a discretionary award of fees under section 1988 is intimately tied to the questions raised in, and overall merits of, the prevailing party's case, *see King v. Greenblatt*, 560 F.2d at 1026–27; it is a request, moreover, that may lead to a sizeable and unpredictable addition to the burdens shouldered by the losing party, *see, e. g., Palmigiano v. Garrahy*, 616 F.2d 598 (1st Cir. 1980) (affirming fee award of $115,483.75); *Lamphere v. Brown University*, 610 F.2d 46 (1st

## B. *Article III Standing*

The first issue is whether plaintiffs have alleged sufficient facts to satisfy the requisites of Article III of the United States Constitution. Plaintiff must allege "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Flast v. Cohen*, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968) *quoting Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). The touchstone of this threshold determination has become whether a plaintiff can establish "injury in fact". See *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99–100, 99 S.Ct. 1601, 1607–08, 60 L.Ed.2d 66 (1979); *Duke Power Company v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 73–81, 98 S.Ct. 2620, 2630–34, 57 L.Ed.2d 595 (1978); *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Rhode Island Committee on Energy v. General Services Administration*, 561 F.2d 397, 401 (1st Cir. 1977). The First Circuit has recently held that this preliminary inquiry "turns largely on the extent to which it appears that plaintiff is suffering tangible harm traceable to the challenged actions of the defendant—harm which will be lessened if the requested remedy is granted." *NAACP Boston Chapter v. Harris*, 607 F.2d 514 (1st Cir. 1979). See *Theriault v. Brennan*, 641 F.2d 28, 31 (1st Cir. 1981). Hence, to decide if plaintiffs have met the standards imposed by Article III, I must determine whether plaintiffs have established 1) a distinct and palpable injury,

Cir. 1979) (award well in excess of $200,000). The ultimate award of fees is, in our view, clearly a part of the overall relief sought and granted during the course of a particular civil rights action.
Resolving, at the outset, an issue that will have considerable impact on who may seek attorney's fees and for what, is particularly desirable in a case, such as this, where the probability of at least partial success on the merits seems high. *See Planned Parenthood League of Mass. v. Bellotti*, 641 F.2d 1006 (1st Cir. 1981) (invalidating parts of an analogous Massachusetts abortion statute).

2) that is fairly traceable to the statutory enactment in question and 3) that the relief requested will redress the injury suffered. *See Theriault v. Brennan*, at 31.

In their complaints, the institutional plaintiffs have alleged only that enforcement of Chapter 23–4.7 would "unduly burden" the "rights of plaintiff's patients to terminate their pregnancies" and would subject operating physicians to possible criminal penalties for noncompliance. By themselves, these allegations may be insufficient to satisfy the first prong of the test I have enumerated above. However, in response to defendants' motions to dismiss, plaintiffs have submitted affidavits that contain further factual allegations.[5] Specifically, the plaintiff institutions have alleged that under the terms of the Rhode Island enactment, they could lose their licensing for failure to comply.[6] Plaintiffs also have alleged that enforcement of various provisions of 23–4.7 will cause them to suffer direct financial losses.[7] These allegations clearly satisfy the first element of the injury-in-fact test because they establish a "palpable" injury.

Plaintiffs' allegations also satisfy the second and third parts of the standing test. The injuries alleged will flow directly from enforcement of the new enactment. In fact, "but for" Chapter 23–4.7, plaintiffs would not suffer any of the anticipated injuries. *See Duke Power Company v. Car-* *olina Environmental Study Group, Inc.*, 438 U.S. at 75–78, 98 S.Ct. at 2631–33. Furthermore, the relief requested by the institutional plaintiffs would, if granted, completely abrogate the feared financial and institutional consequences of enforcement of the abortion statute.

In light of the above conclusions, I hold that the plaintiff medical facilities have established their standing to challenge the constitutionality of Chapter 23–4.7 as it affects them.

### C. Jus Tertii (Surrogate) Standing

The next question is whether plaintiffs may, in challenging the constitutionality of Chapter 23–4.7, raise not only their own rights, but also the rights of third persons not before the Court—women who seek first-trimester abortions. The answer to this question concerns the spectrum of issues that the Court can address at the behest of a party who is already properly before the Court. *See* C. Wright, A. Miller & E. Cooper, 13 Federal Practice and Procedure § 3531, at 205. Resolution of this question does not implicate constitutional considerations. *See Craig v. Boren*, 429 U.S. at 193, 97 S.Ct. at 454; *Warth v. Seldin*, 422 U.S. at 499, 95 S.Ct. at 2205. Instead, the Court must decide whether to allow, as a prudential matter, the assertion of *jus tertii* in a particular case. This decision is shaped by various considerations re-

---

**5.** In *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975), the Court stated:

> For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party. At the same time, it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing. (Citation omitted).

**6.** Although plaintiffs do not explain exactly how they could lose their licenses to operate as medical facilities, I will accept their allegation as true. I note that defendants have not disputed the contention. Further, even if loss of license were not a possibility, the direct financial loss attributable to Chapter 23–4.7, *see*

note 7, *infra*, would yield the necessary injury-in-fact to satisfy the requirements of Article III.

**7.** Plaintiffs contend that they will suffer financial loss primarily because of the "waiting-period" requirement imposed by § 23–4.7–1. This provision mandates that a woman seeking an abortion give her "informed written consent" not more than 7 days nor less than 24 hours before the procedure is performed. According to the institutional plaintiffs, this requirement necessitates an extra visit to the medical facility. This extra visit translates into increased scheduling problems and increased costs to the clinic. These factors, may, in turn, encourage potential patients to seek abortions in neighboring states with no such requirements. Consequently, facilities such as those operated by plaintiffs in this action will suffer a loss of income.

garding the need for, and the potential effectiveness of, a judicial decision on the particular issue presented.

■ In general, courts refuse to allow surrogate standing. *See, e. g., Gladstone Realtors v. Village of Bellwood*, 441 U.S. at 99–100, 99 S.Ct. at 1607–08; *Singleton v. Wulff*, 428 U.S. 106, 113–114, 96 S.Ct. 2868, 2873–74, 49 L.Ed.2d 826 (1976). This " 'rule of self-restraint' [is] designed to minimize unwarranted intervention into controversies where the applicable constitutional questions are ill-defined and speculative." *Craig v. Boren*, 429 U.S. 190, 193, 97 S.Ct. 451, 454, 50 L.Ed.2d 397 (1976). The judicial preference is to avoid deciding abstract questions of wide public significance when other governmental institutions may be more competent to address them and when judicial intervention may not be necessary to protect individual rights. *Friedman v. Harold*, 638 F.2d 262, 265 (1st Cir. 1981), *quoting Warth v. Seldin*, 422 U.S. at 500, 95 S.Ct. at 2206. As the Supreme Court has stated:

> the courts should not adjudicate [third party] rights unnecessarily, and it may be that the holders of those rights either do not wish to assert them, or will be able to enjoy them regardless of whether the in-court litigant is successful or not.... [T]hird parties themselves usually will be the best proponents of their own rights. The courts depend on effective advocacy, and therefore should prefer to construe legal rights only when the most effective advocates of those rights are before them. *Singleton v. Wulff*, 428 U.S. 106, 113–114, 96 S.Ct. 2868, 2873–74, 49 L.Ed.2d 826.

This general rule disfavoring *jus tertii* standing, however, has given way when its underpinnings do not apply.

In *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), the Executive Director of the Planned Parenthood League of Connecticut and a licensed physician were found guilty of aiding and abetting the violation of a Connecticut statute that made it a crime for any person to use any drug or article to prevent conception. They challenged the statute on grounds that it violated the rights of the married people with whom appellants had a professional relationship. Holding that "[t]he rights of husband and wife, pressed here, are likely to be diluted or adversely affected unless those rights are considered in a suit involving those who have this kind of confidential relation to them," 381 U.S. at 481, 85 S.Ct. at 1679, the Court found that the appellants had standing to raise the rights of the absent married people to whom they dispensed contraceptives. This case yielded the principle that, where a close relationship exists between in-court litigants and the third persons whose rights they seek to assert, and where prohibiting such assertion will necessarily result in a dilution of third persons' constitutional rights, the Court will permit the assertion of *jus tertii* by the in-court litigant.

In *Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), Justice Blackmun's plurality opinion extended this principle while considering the constitutionality of a Missouri statute that excluded most abortions from Medicaid coverage. The Court, in discussing whether to allow the physician plaintiffs to raise the rights of women who sought abortions, highlighted the general principles underlying judicial hesitancy to allow the assertion of *jus tertii* standing and noted the specific instances in which it had allowed such assertion. Applying these principles, the Court held that the closeness of the relationship between doctor and patient, in combination with a woman's understandable reluctance to bring suit herself,[8] justified a relaxation of

---

8. In *Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), Justice Blackmun, in the plurality opinion, noted that a "genuine obstacle" may prevent a woman from asserting, herself, her right to an abortion: "[S]he may be chilled from such assertion by a desire to protect the very privacy of her decision from the publicity of a court suit." *Id.* at 117, 96 S.Ct. at 2875. In this concurrence, Justice Powell took issue with the genuineness of this obstacle, calling it "chimerical", *id.* at 126, 96 S.Ct. at 2880 and observing that "[o]ur docket regularly contains cases in which women, using pseudonyms, challenge statutes that al-

the general rule against surrogate standing. 428 U.S. at 117–18, 96 S.Ct. at 2875–76. Accordingly, the physician-plaintiffs were allowed to raise and litigate the rights of their patients.

In *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), the Court extended the principles enunciated by the plurality in *Singleton* to the vendor-purchaser relationship. In *Craig*, the Court considered whether an Oklahoma statutory scheme prohibiting the sale of 3.2% beer to males under the age of 21 and females under age 18 comprised gender-based discrimination against males between the ages of 18 and 21. After ruling that the individual plaintiff's claim was moot, 429 U.S. at 192, the Court considered whether a vendor of 3.2% beer—who had alleged sufficient injury-in-fact to challenge the statute as it applied to her—could "rely on the equal protection objection of males 18–20 years of age to establish her claim to the unconstitutionality of the age-sex differential." 429 U.S. at 192–93, 97 S.Ct. at 454. In holding that the vendor could assert the rights of male purchasers 18–20 years of age, the Court first emphasized that the statutory sections under consideration operated directly on the vendors; they either had to acquiesce in the alleged discrimination or disobey the statute and suffer the applicable sanctions. 429 U.S. at 194, 97 S.Ct. at 455. Second, the Court noted that to the extent that vendors acquiesced, or were un-

able successfully to challenge the statute on the basis of their own rights, the absent 18–21 year old males would suffer a dilution of their constitutional rights. 429 U.S. at 195, 97 S.Ct. at 455. Also important to the Court's conclusion were pragmatic considerations:

> [A] decision by us to forego consideration of the constitutional merits in order to await the initiation of a new challenge to the statute by injured third parties would be impermissibly to foster repetitive and time-consuming litigation under the guise of caution and prudence. Moreover, insofar as the applicable constitutional questions have been and continue to be presented vigorously and "cogently", the denial of *jus tertii* standing in deference to a direct class suit can serve no functional purpose. 429 U.S. at 193–94, 97 S.Ct. at 454–55 (citations omitted).

Finally, the Court observed that "vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." *Id.*

The Court reiterated this approach in *Carey v. Population Services International*, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977), where it considered the constitutionality of a New York law that placed various restrictions on the sale, distribution, and advertising of contraceptives. Once again, the Court was faced with the question

legedly infringe their right to exercise the abortion decision." *Id.* Although Justice Blackmun concedes that the use of a pseudonym may vitiate the genuineness of the publicity obstacle, I am not quite so prepared to accept Justice Powell's rebuttal.

Certainly, a pseudonym disguises the name of a plaintiff insofar as the assigned case-name will not reflect the real name of the person who brought the action. However, I do not accept the surmise that such anonymity abrogates the obstacles to the bringing of suit by a woman seeking to challenge an abortion statute. The cloak of anonymity does not eviscerate the specter of a trial in which the privacy of the woman's abortion decision will be open to exacting public scrutiny. Nor does a pseudonym provide a mask to hide behind while testifying. To call the obstacle of potential publicity "chimerical" in an area as volatile as abortion

rights, I feel, shows a fundamental misunderstanding of the realities of a trial court and of the emotional trauma associated with the abortion decision. Long experience as a Federal District Court Judge has taught me that in cases involving controversial and emotional public issues, the potential of a court-room appearance can be a very imposing deterrent to a law-suit. Particularly in a close-knit community, extensive press coverage combined with natural curiosity and a packed court-room will not long protect the anonymity that Justice Powell finds so effective. In my opinion, Justice Blackmun is correct in finding that the fear of publicity operates as a "genuine obstacle" to actions challenging abortion statutes by women who seek abortions. Courts should recognize this obstacle in deciding whether to allow *jus tertii* standing.

whether to allow *jus tertii* standing. This time, Population Planning Associates, a mail-order contraceptive distributor, sought to assert the rights of its potential customers. 431 U.S. at 682, 97 S.Ct. at 2014. In holding that Population Planning could utilize surrogate standing, the Court confirmed what was implicit in *Craig* regarding the nature of the vendor-purchaser relationship and its bearing on *jus tertii* standing. The Court indicated that when a vendor who challenges a statutory scheme can establish injury-in-fact, that vendor will be permitted to raise the constitutional rights of its customers:

> In this case, as did the statute in *Craig,* § 6811(8) inflicts on the vendor PPA "injury in fact" that satisfies Art. III's case-or-controversy requirement, since "the legal duties created by the statutory section under challenge are addressed directly to vendors such as [PPA. It] is obliged either to heed the statutory [prohibition], thereby incurring a direct economic injury through the constriction of [its] market, or to disobey the statutory command and suffer" legal sanctions. Therefore, PPA is among the "vendors and those in like positions [who] have been uniformly permitted to resist efforts at restricting their operations by acting as advocates for the rights of third parties who seek access to their market or function." 431 U.S. at 683–84, 97 S.Ct. at 2015.

In the case at hand, the institutional plaintiffs represent vendors of medical services including abortions. The women whose rights these facilities seek to assert are purchasers of these services. The institutional plaintiffs, moreover, have clearly alleged that the challenged R.I. statute will cause them sufficient injury-in-fact to satisfy the constitutional element of the standing inquiry. Therefore, under the *Craig/Carey* approach to vendor-purchaser relationships, these plaintiffs should be permitted, almost *per se,* to serve as advocates for the rights of their patients.

In addition to the vendor-purchaser standing principles apparently established by *Craig* and *Carey,* there are other reasons to allow *jus tertii* standing in this case. Because the institutional plaintiffs provide counseling and care for women seeking abortions, a close relationship necessarily exists between the in-court litigants and the third persons whose rights are being asserted. This relationship is rooted in the very right which plaintiffs seek to advance on behalf of their patients. In addition, if the medical facilities are not allowed to raise the constitutional rights of their women patients, such rights could easily become diluted. Women might be forced to suffer unjustified restrictions on their right to a first-trimester abortion because medical clinics elect to comply with a law that such facilities cannot, themselves, effectively challenge. Such dilution is even more likely in a case like this, where women whose rights are affected may be reticent to give up the privacy of their abortion decision by coming forward as plaintiffs in a law suit.[9] Moreover, this is not a case in which the third persons do not desire to have their rights protected by surrogates. *Cf. Friedman v. Harold,* 638 F.2d at 266 (Trustee in Bankruptcy's position contrary to desires of bankrupt whose rights the trustee sought to raise). Women abortion patients have no interest in opposing the assertion of their rights by the institutional plaintiffs in this case. Finally, even if women patients were inclined to challenge the constitutionality of R.I.G.L. Chapter 23–4.7 themselves, I perceive no good reason to await such challenge. To do so would be to foster repetitive and time-consuming litigation notwithstanding the presence of in-court litigants who have every incentive to make vigorous and cogent arguments as surrogates for their patients. *See Craig v. Boren,* 429 U.S. at 194, 97 S.Ct. at 455; *Singleton v. Wulff,* 428 U.S. at 117–18, 96 S.Ct. at 2875, 2876.

To adopt the position urged by the State would be to force women who might desire a legal abortion either to suffer dilution of their constitutional rights or to forego the privacy and intimacy of their decision to invoke such right. Such an approach would

9. *See* discussion in Note 8, *supra.*

serve only to delay and complicate the instant litigation. Accordingly, I hold that the institutional plaintiffs may assert the rights of their women patients in challenging the constitutionality of the Rhode Island abortion statute. Defendants' motions to dismiss are denied.

It is so ordered.