**FLORIDA WOMEN'S MEDICAL CLINIC, INC., et al., Plaintiffs,**

v.

**Jim SMITH, etc., et al., Defendants.**

**No. 79–6063–CIV–JAG.**

United States District Court,
S. D. Florida, N. D.

March 12, 1982.

Frances M. Farina, Farina, Wiener & Schmitz, Miami Shores, Fla., for plaintiff.

Jim Smith, Atty. Gen., James A. Peters, Asst. Atty. Gen., Tallahassee, Fla., for defendants.

## ORDER

GONZALEZ, District Judge.

THIS CAUSE is before the Court on Cross Motions for Summary Judgment on the Amended Verified Class Action Complaint.

Plaintiff, Florida Women's Medical Clinic, Inc. (Clinic), is an out-patient abortion facility which performs only first trimester abortions. Plaintiff, Garry H. Wachtel, M.D. is a licensed physician who regularly performs first trimester abortions at the Clinic. Plaintiff, Michael J. Benjamin, M.D. is a licensed physician who regularly performs first trimester abortions in his private office.

Plaintiffs brought this class action against Jim Smith, as Attorney General for the State of Florida; David Pingree, as Secretary of the Department of Health and Rehabilitative Services; and Michael J. Satz, as State Attorney for the Seventeenth Judicial Circuit in and for Broward County, Florida.

The plaintiffs seek injunctive and declaratory relief pursuant to 42 U.S.C. § 1983.

The gravamen of the amended complaint is that the Florida Abortion Clinic Law, Fla.Stat. §§ 390.001–390.025, as amended (Supp.1980), and the amended regulations promulgated thereunder by the Florida Department of Health and Rehabilitative Services (HRS), chapter 10D–72, Florida Administrative Code,, are unconstitutional as applied to first trimester abortions. The text of the statute and the rules are contained in Appendix A and Appendix B respectively.

This action was originally filed in February, 1979. Thereafter this court held that the rules and regulations promulgated by HRS impermissibly invaded the constitutional right of privacy and that the state failed to demonstrate a compelling interest to warrant regulation of first trimester pregnancy terminations. *Florida Women's Medical Clinic, Inc. v. Smith*, 478 F.Supp. 233 (S.D.Fla.1979) *appeal dismissed*, 620 F.2d 297 (5th Cir. 1980). The court went on to hold that the statutory licensing scheme, once sterilized by the ruling that the regulations were unconstitutional, did not pose an objectionable intrusion into the fundamental right of privacy. *Id.* at 236.

Thereafter, cross appeals were filed in the United States Court of Appeals for the

Fifth Circuit. During the pendancy of that appeal the Florida Abortion Clinic Law was amended.

Plaintiffs sought to amend their complaint or to remand this cause to the district court, in order to challenge the law as amended. The Fifth Circuit denied the motion to amend but granted the motion to remand to enable plaintiffs to amend their complaint and challenge the 1980 enactment.

In arriving at its earlier decision this court was guided by the well settled general principle that courts will not pass on the constitutionality of an act of the legislature if the merits of the case may be fairly determined otherwise without so doing. *Flint v. Stone Tracy Co.*, 220 U.S. 107, 31 S.Ct. 342, 55 L.Ed. 389 (1911).

Thereafter the state did not see fit to amend the regulations previously promulgated so as to overcome the constitutional deficiencies earlier found by this court, but rather amended the statutes in question.

It is now clear in the light of the history of this matter that disposition of the constitutional questions presented is both imperatively required and unavoidable. *Bush v. Texas*, 372 U.S. 586, 83 S.Ct. 922, 9 L.Ed.2d 958 (1963); *United States v. Hayman*, 342 U.S. 205, 72 S.Ct. 263, 96 L.Ed. 232 (1952).

Accordingly, this court granted plaintiffs leave to amend their original complaint and temporarily enjoined the enforcement of the Florida Abortion Clinic Law, Fla.Stat. §§ 390.001–390.025, as amended, and the amended rules and regulations adopted by HRS, insofar as they apply to first trimester abortions.

Thereafter, the court granted plaintiffs' motion for class certification allowing the named plaintiffs to represent the class composed of a) all first trimester abortion facilities in the State of Florida; b) all physicians licensed by the State of Florida who perform first trimester abortions in such facilities; c) all physicians licensed by the State of Florida who perform first trimester abortions in their private offices who may be subject to regulation; and d) all women of childbearing age who are or may become pregnant and who desire first trimester abortions.

Pursuant to the order of the court, the parties have submitted cross motions for summary judgment as to the constitutionality *vel non* of the statute and the regulations in their amended form.

The statute precludes abortion clinics ["any facility in which abortions are performed, other than a hospital or physician's office which is not used primarily for the performance of abortions," section 390.011(2)] from operating without a license issued by HRS. Fla.Stat. § 390.014.

In addition, HRS is delegated broad rule-making authority pursuant to section 390.012(1).

The department shall have the authority to develop and enforce rules for the health, care, and treatment of persons in abortion clinics and for the safe operation of such clinics. These rules shall be comparable to rules which apply to all surgical procedures requiring approximately the same degree of skill and care as the performance of first trimester abortions. The rules shall be reasonably related to the preservation of maternal health of the clients. The rules shall not impose a legally significant burden on a woman's freedom to decide whether to terminate her pregnancy.

The amendment contained in section 390.012(1) grants even more sweeping authority to HRS than its predecessor [1] to promulgate rules which provide for:

---

1. Fla.Stat. § 390.012 (Supp.1978) provided, in relevant part, as follows:

   The rules [adopted by HRS] shall provide for, but shall not be limited to:
   1) The establishment of minimum standards for the care and treatment of clients of an abortion clinic;

   2) The availability of aftercare services and emergency medical services to be administered by a hospital; and
   3) The transportation of patients requiring emergency care from an abortion clinic to a licensed hospital

(a) The establishment of minimum standards for the care and treatment of clients of an abortion clinic;

(b) The availability of aftercare services and emergency medical services to be administered by a hospital;

(c) The transportation of patients requiring emergency care from an abortion clinic to a licensed hospital;

(d) The cleanliness of an abortion clinic and the area where the abortion is to be performed, which shall be consistent with the performance of surgical procedures generally, including the proximate location of sinks and the use of sterilized instruments in a sanitary environment, in the interest of protecting the health of the woman;

(e) The prompt and proper disposal of fetal remains and tissue resulting from the abortion, in the interest of protecting the public health; and

(f) The making, protection, and preservation of patient records, which shall be treated as medical records under chapter 458.

In the exercise of its mandate HRS promulgated amended rules which govern the licensing and regulation of clinics performing first trimester abortions.

The newly adopted rules set forth eight areas of regulation as follows:

| | |
|---|---|
| 10D–72.10 | Licensure Procedures |
| 10D–72.11 | Medical Services |
| 10D–72.12 | Abortion Clinic Staff |
| 10D–72.13 | Medical Records |
| 10D–72.14 | Laboratory Services and Facilities |
| 10D–72.15 | Sanitation, Housekeeping and Maintenance |
| 10D–72.16 | Disposal of Fetal Remains |

The statute provides for a transition period, not to exceed one year, within which presently existing clinics must comply with the rules. Fla.Stat. § 390.013. HRS then adopted a 90-day transition period. Rule 10D–72.17.

The penalty sections of the statute, which are then in effect, also delegate broad authority to HRS. Section 390.019 mandates a pre-licensing inspection of an abortion facility and further provides that HRS "shall make such additional inspections and investigations as may be necessary to assure compliance with this act."

Should HRS determine that an abortion facility is in non-compliance with the statute or the rules thereunder, HRS may institute legal proceedings to enjoin the operation of that facility. Fla.Stat. § 390.021.

In addition, HRS may revoke, suspend, or not renew a license if a clinic has violated any of the act's provisions or any rule or lawful order of HRS, or impose a fine not to exceed $1,000 for each violation. Fla. Stat. §§ 390.017, 390.018.

Finally, the failure to dispose of fetal remains in the appropriate manner constitutes a misdemeanor of the first degree. Fla.Stat. § 390.012(2).

The issues before the court may be divided as follows: first, whether the regulatory scheme unlawfully impinges on the constitutional right to privacy; second, whether the licensing provisions of the statute and the rules thereunder impermissibly intrude into this protected right.

Plaintiffs maintain that Florida's comprehensive regulatory scheme singles out the first trimester abortion process from similar medical procedures, unduly interferes with that process, and has not been substantiated by a compelling state interest. Moreover, they contend that compliance with the statute and the regulations would raise the cost of first trimester abortions and place the procedure beyond the financial means of a significant number of women.

Defendants submit that a regulatory plan which merely increases the cost of first trimester abortions and does not invade a woman's freedom to decide whether or not to terminate her pregnancy, must only provide a reasonable means to effectuate legitimate state goals. In sum, the state is not required to provide a first trimester abortion which is financially available to all pregnant women who wish to terminate their pregnancies.

Thus, the court must once again determine the breadth of the fundamental right which is at stake.

The starting point of any discussion of a woman's right to an abortion is *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), where the Court held unconstitutional a Texas statute which excepted from criminality only those abortions procured or attempted by medical advice for the purpose of saving the mother's life. The Court based its decision on the "liberty" component of the Due Process Clause of the Fourteenth Amendment which encompasses a freedom of personal choice in certain matters of marriage and procreation. *See Loving v. Virginia*, 388 U.S. 1, 12, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967); *Skinner v. Oklahoma*, 316 U.S. 535, 541–42, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942). This constitutional right of privacy "is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." 410 U.S. at 153, 93 S.Ct. at 727.

■ Since the decision to terminate a pregnancy is a fundamental right, its regulation may be justified only by a "compelling state interest" and by a legislative enactment properly tailored to express only the legitimate state interest at stake. *Id.* at 155, 93 S.Ct. at 728. Thus, this fundamental right of personal privacy is not absolute and accordingly must be weighed against legitimate state interests in safeguarding maternal health, maintaining medical standards, and protecting potential life. *Id.* at 154, 93 S.Ct. at 727.

The Court articulated a framework within which to analyze these competing interests. At the heart of this framework lies the proposition that the interests of the state in regulating abortions grows in substantiality as the woman approaches the end of the nine month period of gestation.

(a) For the stage prior to approximately the end of the first trimester, the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician.

(b) For the stage subsequent to approximately the end of the first trimester, the State, in promoting its interest in the health of the mother, may, if it chooses, regulate the abortion procedure in ways that are reasonably related to maternal health.

(c) For the stage subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother. *Id.* at 164–65, 93 S.Ct. at 732.

*Roe v. Wade* and *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973) provide some guidance, albeit in dicta, as to the scope of permissible state regulation.

In *Roe*, the Court stated that during the period following the conclusion of the first trimester, regulations reasonably related to the preservation and protection of maternal health, include the decision as to the facility in which the abortion may be performed, the licensing of that facility, the determination as to who may perform an abortion, and requirements as to the licensure of that person. 410 U.S. at 163, 93 S.Ct. at 732. *See Doe v. Bolton*, 410 U.S. at 194–95, 93 S.Ct. at 748–49.

Subsequent to *Roe* and *Doe* the Court has had the opportunity to address the permissible range of regulation of first trimester abortions.

First, the Court upheld the requirement that all abortions, including those performed during the first trimester, be performed by a licensed physician. *Connecticut v. Menillo*, 423 U.S. 9, 96 S.Ct. 170, 46 L.Ed.2d 152 (1975) (per curiam). This decision is based on the determination in *Roe* that a first trimester abortion is as safe for the woman as childbirth. That finding can only be sustained if "the abortion is performed by medically competent personnel under conditions insuring maximum safety for the woman." *Menillo*, 423 U.S. at 11, 96 S.Ct. at 171.

Next the Court upheld two statutory provisions regulating first trimester abortions in *Planned Parenthood of Central Missouri*

*v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976). First, the requirement that the woman provide written consent to the abortion procedure was permissible because it assured the woman's awareness of her decision and its significance. *Id.* at 67, 96 S.Ct. at 2840. Second, the requirement that records of abortions be maintained, although approaching impermissible limits, was not unconstitutional because such records are useful in promoting the State's interest in promoting the health of its female citizens. *Id.* at 81, 96 S.Ct. at 2846.

Finally, in *Sendak v. Arnold*, 429 U.S. 968, 97 S.Ct. 476, 50 L.Ed.2d 579 (1976) the Court summarily affirmed a lower court order declaring unconstitutional portions of the Indiana abortion statute. 416 F.Supp. 22 (S.D.Ind.1976). The relevant statute required all abortions, including those performed during the first trimester, to be performed in a hospital or licensed facility which provided "the basic safeguards as provided by a hospital admission, and has immediate hospital backup ..." Ind.Code § 35–1–58.5–2(a)(1) (1975). The lower court emphasized that *Roe* and *Doe* expressly provided that the State may designate the facility wherein a pregnancy may be terminated, only after the compelling point, which is the end of the first trimester. 416 F.Supp. at 24.

Plaintiffs rely, *inter alia*, on *Roe* and its progeny to support their position that the statute and the administrative rules are unconstitutional.

In reply, and in support of their own motion for summary judgment, defendants rely on a second series of abortion cases, *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977) and *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), as well as several lower court decisions.

In *Maher*, the Court held that the scope of the protection afforded by *Roe v. Wade* did not include an entitlement to Medicaid payments for nontherapeutic abortions even though the State did provide payments for medical services incident to childbirth. The State had made a "value judgment favoring childbirth over abortion, and ... implement[ed] that judgment by the allocation of public funds." 432 U.S. at 474, 97 S.Ct. at 2382. The State's value judgment was constitutionally permissible because the restriction on the availability of an abortion was not State-created. "The indigency that may make it difficult—and in some cases, perhaps, impossible—for some women to have abortions is neither created nor in any way affected by the Connecticut regulation." *Id.* at 474, 97 S.Ct. at 2383.

Similarly, in *Harris v. McRae* the Court upheld the Hyde Amendment which limited the availability of medicaid funds for certain medically necessary abortions. Again the Court found that the challenged statute "place[d] no governmental obstacle in the path of a woman who chooses to terminate her pregnancy, but rather, by means of unequal subsidization of abortion and other medical services encourages alternative activity deemed in the public interest." 448 U.S. at 315, 100 S.Ct. at 2687.

Inasmuch as the relevant statutes did not impinge on a fundamental right, both cases were judged by the due process standard which requires that legislative enactment bear a rational relationship to a legitimate governmental interest. *McRae*, 448 U.S. at 324–26, 100 S.Ct. at 2692–93. *Maher*, 432 U.S. at 478–79, 97 S.Ct. at 2385.

Defendants also contend that the reasoning adopted by the lower courts in *Westchester Women's Health Organization v. Whalen*, 475 F.Supp. 734 (S.D.N.Y.1979) ("WWHO") and *Birth Control Centers, Inc. v. Reizen*, 508 F.Supp. 1366 (E.D.Mich.1981), should be applied herein.

In *WWHO* the issue before the court was whether the New York statutory and regulatory scheme regulating hospitals and other health service facilities was unconstitutional as applied to pregnancy termination facilities which performed first trimester abortions. The court upheld the comprehensive scheme as applied to the abortion clinics because its application did not intrude on a woman's freedom to decide whether or not to terminate her pregnancy. 475 F.Supp. at 740–41.

The fact that an abortion clinic must conform to minimum health and safety standards would not in any way coerce a woman into not having an abortion; indeed, the opposite effect would probably result in that a woman would be assured that certain health and safety standards had been met.

*Id.* at 741.

Similarly, in *Birth Control Centers* the court upheld a statutory and regulatory scheme applicable to all "freestanding surgical outpatient facilities" insofar as they applied to first trimester abortions.

Both cases relied on by the defendants are distinguishable. First, neither the New York nor the Michigan regulatory schemes limit their application to first trimester pregnancy termination facilities. In each instance the State exercised its police powers to promote public health and sought to provide a comprehensive health package for all health service facilities. The State of Florida, however, has chosen to single out the first trimester abortion procedure from similar medical procedures and subject it to sweeping regulation.

Second, the regulations which were upheld in *Birth Control Centers* include the reporting and recordkeeping provisions which were approved in *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976). Moreover the restriction that "freestanding surgical outpatient facilities" may only perform "uncomplicated pregnancies of not over 14 weeks' duration" is based on the proposition in *Roe v. Wade* that the State's interest becomes compelling at the end of the first trimester. 508 F.Supp. at 1380–1381.

The legislative and regulatory enactments upheld in *WWHO* are somewhat analogous to the scheme imposed in Florida, and as such the case is not readily distinguishable on its facts. This court finds that the court in *WWHO* read the protected right too narrowly.

A review of the abortion decisions since *Roe v. Wade* indicates the existence of three strands of the constitutional right to privacy insofar as it applies to the termination of a pregnancy.

■ First the decisionmaking process itself is left to the woman in consultation with her physician and is guarded from unwarranted intrusion by the state. *See Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) (state may not require consent of the spouse as a condition for obtaining a first trimester abortion); *Bellotti v. Baird,* 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (state may not require pregnant minor to obtain parental consent to undergo an abortion where that consent may operate as an absolute veto). *Cf. H. L. v. Matheson,* 450 U.S. 398, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981) (state may require the physician of an unemancipated, dependent minor to notify, if possible, the minor's parents prior to performing an abortion).

■ The second strand is an outgrowth of the freedom to decide, and incorporates the interest-balancing analysis set forth by the Court in *Roe v. Wade.* Thus, the State is precluded from regulating first trimester abortion facilities absent a compelling state interest. *See Sendak v. Arnold,* 429 U.S. 968, 97 S.Ct. 476, 50 L.Ed.2d 579 (1976); *Friendship Medical Center, Ltd. v. Chicago Board of Health,* 505 F.2d 1141 (7th Cir. 1974), *cert. denied,* 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 (1975). During the second trimester the State may "regulate the abortion procedure in ways that are reasonably related to maternal health." *Roe,* 410 U.S. at 164, 93 S.Ct. at 732. Finally, during the period after viability the State in advancing its interest in the potentiality of human life, may regulate or proscribe abortions except where the life or health of the mother is jeopardized. *Id.* at 164–65, 93 S.Ct. at 732.

■ The third deals with the question of whether the State must remove obstacles to facilitate access to first trimester abortions. It is now clear that while government may not engineer the imposition of obstacles it need not remove those which it did not create in the first instance. *See Harris v.*

*McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980); *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977). Enactments which merely advance the public interest in an alternative activity enjoy the presumption of constitutionality and will be upheld provided they bear a reasonable relationship to the public interest.

The components of this abortion construct are not separated by bright lines. There will be instances of overlap and few, if any, cases will be susceptible of being pigeonholed into one of the categories.

The comprehensive plan which plaintiffs assail fairly falls within the second category and must be measured by a heightened level of judicial review.

The court finds the Seventh Circuit's decision in *Friendship Medical Center, Ltd. v. Chicago Board of Health*, 505 F.2d 1141 (7th Cir. 1974), illuminating. There the court held unconstitutional regulations applicable to facilities performing first trimester abortions. The court rejected the argument of a distinction between regulating the abortion decision and regulating the manner by which the decision is effectuated.

> The regulations by their very nature restrict the abortion decision and affect whether and in what manner an abortion will take place. The decision whether or not to abort a pregnancy cannot be made in a vacuum without regard to ... under what conditions it will be performed, and what procedure will be followed. All these are involved in any abortion decision and it is precisely these elements of the decision that the regulations here challenged seek to control.

*Id.* at 1151.

■ This court, like the Seventh Circuit, is not unmindful of the State's laudable goals in adopting the statute and promulgating the regulations. However, the existence of laudable goals, standing alone, does not provide a compelling state interest.

The task that remains for this court is the determination of the constitutionality of the statutory and regulatory provisions adopted by the State of Florida.

*Medical Services, Laboratory Facilities, Sanitation, Disposal of Fetal Remains.* Fla. Stat. § 390.012 grants rulemaking authority to HRS "to develop and enforce rules for the health, care, and treatment of persons in abortion clinics and for the safe operation of such clinics." See Appendix A for complete text.

Pursuant to that mandate, HRS promulgated the following rules as part of the Florida Administrative Code: 10D–72.11; 10D–72.14; 10D–72.15; 10D–72.16.

■ These rules require, *inter alia*, that abortion clinics and the physicians who perform first trimester abortions maintain specified equipment in the clinic; prepare a written pamphlet outlining post-operative treatment; perform specified tests prior to the abortion procedure; make available certain medications for post-operative treatment; establish procedures to maintain proper sanitation; and to dispose of fetal remains in a nuisance-free manner. See Appendix B for the complete text.

These provisions fall within the second category of the court's abortion construct— *regulation* of first trimester abortions. The statute and rules circumscribe the *facilities* themselves and the *procedures* used to perform first trimester abortions. They clearly run afoul of the standards articulated in *Roe v. Wade*, where the Court held that during the first trimester,

> the attending physician, in consultation with his patient, is free to determine without regulation by the State, that, in his medical judgment, the patient's pregnancy should be terminated. If that decision is reached, the judgment may be effectuated by an abortion free of interference by the State.

410 U.S. at 163, 93 S.Ct. at 732.

Moreover, "during the first stage of pregnancy the State may impose no restrictions or regulations governing the medical judgment of the pregnant woman's attending physician with respect to the termination of her pregnancy." *Planned Parenthood of Central Missouri*, 428 U.S. at 80, 96 S.Ct. at 2846.

Here the State has attempted to interfere with the procedure and process by which the decision to abort a pregnancy will be effectuated. As the court has previously stated, laudable goals do not rise to the level of a compelling state interest.

Fla.Stat. § 390.012(1)(a) through (e), (2) and the rules cited above impermissibly regulate first trimester abortions; they cannot withstand the challenge to their constitutionality.

■■■ *Abortion Clinic Staff.* Pursuant to its statutory mandate HRS adopted Rule 10D–72.12 which requires, *inter alia*, that first trimester abortions be performed by a duly licensed physician.[2]

To limit the performance of first trimester abortions to licensed physicians was accepted in *Connecticut v. Menillo*, 423 U.S. 9, 96 S.Ct. 170, 46 L.Ed.2d 152 (1975) (per curiam) in which the Court upheld the enforcement of an abortion statute imposing criminal penalties against a non-physician.

Although it is not clear whether the plaintiffs assail this provision of the Florida plan, the challenge, if one has been made, must be rejected.

Rule 10D–72.12, however, does not rest with the requirement that a physician perform the abortion. The rule also requires the attendance of a nurse and the employment of such additional personnel as may be needed to assure sound medical practice.

What constitutes sound medical practice in an individual case is a matter of professional judgment arrived at based upon training, experience and needs of the patient under consideration.

To permit the state to dictate to a qualified and licensed physician what procedures he will follow in treating his patient is to inject the government into the very heart of the physician-patient relationship. In effect, it makes the state the final arbiter of what constitutes sound medical practice in a particular case.

It substitutes the medical judgment of a faceless regulatory bureaucracy probably headquartered in some distant city for that of the physician of the patients choice.

These requirements intrude into the medical judgment of the attending physician and are not sustained by a compelling state interest. Accordingly, these restrictions cannot stand.

■■■ *Recordkeeping.* Section 390.-012(1)(f) of the statute and Rule 10D–72.13 require the maintenance of patient records.[3] It is settled that recordkeeping and reporting requirements, although reaching the outer limits of constitutionality, are permissible. *Planned Parenthood of Central Missouri*, 428 U.S. at 79–81, 96 S.Ct. at 2845–2846.

The court finds that the Florida recordkeeping provisions do not impose a legally significant impact either on the decision to undergo an abortion or on the physician-patient relationship. Accordingly, they will be upheld.

*Licensing.* Pursuant to Fla.Stat. §§ 390.-014 through 390.016 and Rule 10D–72.10 abortion clinics must apply for and obtain a license from HRS.

Plaintiffs contend that this requirement constitutes a regulation of first trimester abortions and must be held unlawful because the defendants have failed to demonstrate a compelling state interest.

■■■ The court finds that a licensing restriction is proper provided it is not used as a subterfuge to infringe on the constitutional right to a first trimester abortion, free from state-created obstacles placed in the path of effectuating that decision. Moreover, a licensing provision is permissible when obtaining the license is not predicated on adherence to unconstitutional conditions.

Since the court has already held the intrusive portions of the statute and rules

---

2. Fla.Stat. § 390.001(3) also provides that "No termination of pregnancy shall be performed at any time except by a physician as defined in this section."

3. A similar requirement is contained in Fla. Stat. § 390.002.

unduly burdensome the remaining conditions to successfully obtain a license are permissible—that the abortion be performed by a physician, that the clinic maintain records, and that the applicant submit a license fee of not less than $35.00 nor more than $75.00.

The licensing requirement, standing alone, poses no threat, actual or putative, to the protected right to privacy. It does not intrude into the physician-patient relationship or the decision-making process. Moreover, the licensing requirement is not an obstacle placed in the path of a woman seeking to effectuate her decision to terminate her pregnancy.

The decision in *Sendak v. Arnold*, 429 U.S. 968, 97 S.Ct. 476, 50 L.Ed.2d 579 (1976), is not inapposite. There the statute in question limited the performance of first trimester abortions to "a hospital or licensed health facility . . . which offers the basic safeguards as provided by hospital admission, and has immediate hospital back-up. . . ." Ind.Code § 35–1–58.5–2(a)(1) (1975).

The Indiana statute provided for licensing *plus* substantive regulations of the facilities and was unconstitutional because it sought to regulate those facilities and the procedures used to perform first trimester abortions. This the State may not do absent a compelling interest.

This court is not unmindful of the dicta contained in *Roe v. Wade* in which the Court stated that *after* the first trimester the licensing of an abortion facility is reasonable. 410 U.S. at 163, 93 S.Ct. at 731. A literal reading of the Court's complete statement would likewise preclude the State from requiring that only a licensed physician be permitted to perform first trimester abortions. Such an interpretation was not followed in *Connecticut v. Menillo*, 423 U.S. 9, 96 S.Ct. 170, 46 L.Ed.2d 152 (1975) (per curiam), and will not be followed in the instant case.

The Florida licensing requirement, once tailored by the court's removal of the unconstitutional portions of the statute and the rules does not constitute the regulation of first trimester abortions within the meaning of *Roe v. Wade* and its progeny.

■ A licensing requirement passes constitutional muster if it bears a reasonable relationship to a legitimate governmental interest. *See Williamson v. Lee Optical, Inc.*, 348 U.S. 483, 488–91, 75 S.Ct. 461, 464–66, 99 L.Ed. 563 (1955). The licensing requirement is a proper means for the State of Florida to ensure that only physicians are performing abortions and that clinics are maintaining patient records which are to be used for statistical purposes.

The licensing requirement will accordingly be upheld.

■ *Fetal Remains.* Although the prompt and proper disposal of fetal remains and tissue resulting from the abortion does rise to the level of a compelling state interest in protecting *public* health, it is in no way reasonably related to *maternal* health.

The Court in *Leigh v. Olson*, 497 F.Supp. 1340 (D. N.D. 1980), found that while regulation of fetal disposal may be related to the State's interest in protecting the *public* health, it was not even rationally related to protecting *maternal* health.

Florida Statute § 390.012(1) provides that the rules promulgated thereunder shall be "reasonably related to the preservation of maternal health of the clients." *Cf.* §§ 390.012(1)(e), 390.012(2) and Rule 10D–72.16. It follows that although this portion of § 390.012(1) does pass constitutional muster, any regulation adopted thereunder does not. The constitutionality of this portion of the statute will be upheld but Rule 10D–72.16 will be declared void.

The court having given careful consideration to all of the issues presented and being otherwise duly advised, it is ORDERED AND ADJUDGED as follows:

1) That the preliminary injunction enjoining the enforcement of Fla.Stat. §§ 390.001–390.025, as amended, and the rules adopted thereunder be and the same is hereby VACATED;

2) That Plaintiffs' Motion for Summary Judgment be and the same is hereby GRANTED in part and DENIED in part.

3) That Defendants' Motion for Summary Judgment be and the same is hereby GRANTED in part and DENIED in part.

4) That the defendants, Jim Smith, as Attorney General for the State of Florida; David Pingree, as Secretary of the Department of Health and Rehabilitative Services of the State of Florida; and Michael J. Satz, as State Attorney for the Seventeenth Judicial Circuit in and for Broward County, Florida, their successors, agents, attorneys and employees are hereby PERMANENTLY ENJOINED from enforcing the following portions of Chapter 390, Florida Statutes, and the rules promulgated thereunder in Chapter 10D–72, Florida Administrative Code:

a) Fla.Stat. § 390.012(1)(a) through (e), (2); except that insofar as section 390.012(1) provides authority for the adoption of the requirements that a physician perform the abortion, that records be kept, and that there be prompt and proper disposal of fetal remains and tissue resulting from the abortion, the statute will be upheld and will remain in full force and effect.

b) Rule 10D–72.11;

c) Rule 10D–72.12(2)(3);

d) Rule 10D–72.14;

e) Rule 10D–72.15;

f) Rule 10D–72.16

5) That costs will be taxed in favor of Plaintiffs and against Defendants.

### APPENDIX A

390.011 Definitions

As used in this act:

(1) "Abortion" means the termination of human pregnancy with an intention other than to produce a live birth or to remove a dead fetus.

(2) "Abortion clinic" or "clinic" means any facility in which abortions are performed, other than a hospital or a physician's office which is not used primarily for the performance of abortions.

(3) "Department" means the Department of Health and Rehabilitative Services.

(4) "Hospital" means a facility licensed under chapter 395.

(5) "Physician" means a physician licensed under chapter 458 or chapter 459 or a physician practicing medicine or osteopathy in the employment of the United States or this state.

(6) "Third trimester" means the weeks of pregnancy after the 24th week of pregnancy.

390.012 Powers of department; rules

(1) The department shall have the authority to develop and enforce rules for the health, care, and treatment of persons in abortion clinics and for the safe operation of such clinics. These rules shall be comparable to rules which apply to all surgical procedures requiring approximately the same degree of skill and care as the performance of first trimester abortions. The rules shall be reasonably related to the preservation of maternal health of the clients. The rules shall not impose a legally significant burden on a woman's freedom to decide whether to terminate her pregnancy. The rules shall provide for:

(a) The establishment of minimum standards for the care and treatment of clients of an abortion clinic;

(b) The availability of aftercare services and emergency medical services to be administered by a hospital;

(c) The transportation of patients requiring emergency care from an abortion clinic to a licensed hospital;

(d) The cleanliness of an abortion clinic and the area where the abortion is to be performed, which shall be consistent with the performance of surgical procedures generally, including the proximate location of sinks and the use of sterilized instruments in a sanitary environment, in the interest of protecting the health of the woman;

(e) The prompt and proper disposal of fetal remains and tissue resulting from the abortion, in the interest of protecting the public health; and

(f) The making, protection, and preservation of patient records, which shall be treated as medical records under chapter 458.

(2) Failure to dispose of fetal remains and tissue in a manner consistent with the disposal of other human tissue in a competent professional manner shall constitute a public nuisance and health hazard subject to license suspension or revocation and guilty of a misdemeanor of the first degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

390.013 Effective date of rules

Any abortion clinic which is in operation at the time of adoption of any applicable rule under this act shall be given a reasonable time under the particular circumstances, not to exceed 1 year from the date of such adoption, within which to comply with such rule.

390.014 Licenses; fees, display, etc.

(1) No abortion clinic shall operate in this state without a currently effective license issued by the Department of Health and Rehabilitative Services.

(2) A separate license shall be required for each clinic maintained on separate premises, even though it is operated by the same management as another clinic; but a separate license shall not be required for separate buildings on the same premises.

(3) The annual license fee required for a clinic shall be nonrefundable and shall be equal to $1 times the authorized patient capacity of the clinic; however, the fee shall not be less than $35, nor more than $75.

(4) Counties and municipalities applying for licenses under this act shall be exempt from the payment of the license fees.

(5) The license shall be displayed in a conspicuous place inside the clinic.

(6) A license shall be valid only for the clinic to which it is issued, and it shall not be subject to sale, assignment, or other transfer, voluntary or involuntary. No license shall be valid for any premises other than those for which it was originally issued.

390.015 Application for license

(1) An application for a license to operate an abortion clinic shall be made to the department on a form furnished by it for that purpose. The application shall be accompanied by the applicable license fee.

(2) The application, which shall be made under oath, shall contain, among other things, the following:

(a) The name and address of the applicant if the applicant is an individual; or if the applicant is a firm, partnership, or association, the name and address of each member thereof; or if the applicant is a corporation, its name and address and the name and address of each of its officers.

(b) The name by which the clinic is to be known.

(c) The location of the clinic for which application is made and a statement that local zoning ordinances permit such location.

(d) The name of the person or persons under whose management or supervision the clinic will be operated.

390.016 Expiration of license; renewal

(1) A license issued for the operation of an abortion clinic, unless sooner suspended or revoked, shall expire 1 year from the date of issuance. Sixty days prior to the expiration date, an application for renewal of such license shall be submitted to the department on a form furnished by the department. The license may be renewed if the applicant has met the requirements of this act and of all rules adopted pursuant to this act.

(2) A licensee against which a revocation or suspension proceeding is pending at the time of license renewal may be issued a conditional license which shall be effective until final disposition of the proceeding by the department. If judicial relief is sought from the order resulting from the revocation or suspension proceeding, the court having jurisdiction may order that the conditional license be continued for the duration of the judicial proceeding.

390.017 Grounds for suspension or revocation of license

The license of an abortion clinic may be revoked, or may be suspended for a period not to exceed 2 years, or the department may refuse to renew such license, if it is

determined in accordance with the provisions of chapter 120 that the clinic has violated a provision of this act or any rule or lawful order of the department.

390.018 Administrative penalty in lieu of revocation or suspension

If the department finds that one or more grounds exist for the revocation or suspension of a license issued to an abortion clinic, the department may, in lieu of such suspension or revocation, impose a fine upon the clinic in an amount not to exceed $1,000 for each violation. The fine shall be paid to the department within 60 days from the date of entry of the administrative order. If the licensee fails to pay the fine in its entirety to the department within the period allowed, the license of the licensee shall stand suspended, revoked, or renewal or continuation may be refused, as the case may be, upon expiration of such period and without any further administrative or judicial proceedings.

390.019 Inspections; Investigations

The department shall make or shall cause to be made an inspection of an abortion clinic prior to licensing such clinic, and it shall make such additional inspections and investigations as may be necessary to assure compliance with this act.

390.021 Injunction

In addition to the other powers provided by this act, the department may institute injunction proceedings in a court of competent jurisdiction to restrain or prevent the establishment or operation of an abortion clinic which does not have a license or is in violation of any provision of this act or of any rules adopted pursuant to this act.

APPENDIX B

RULES OF STATE OF FLORIDA DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES

CHAPTER 10D–72, FLORIDA ADMINISTRATIVE CODE

ABORTION CLINICS

ADDING SECTIONS 10D–72.10 THRU 10D–72.17

10D–72.10   Licensure Procedures

10D–72.11   Medical Services

10D–72.12   Abortion Clinic Staff

10D–72.13   Medical Records

10D–72.14   Laboratory Services and Facilities

10D–72.15   Sanitation, Housekeeping and Maintenance

10D–72.16   Disposal of Fetal Remains

10D–72.17   Effective Date of Compliance

10D–72.10   Licensure Procedures.

(1) Application for a license to operate an abortion clinic shall be made to the Department on forms furnished for that purpose. The application shall be accompanied by the applicable license fee. The application which shall be notarized, shall contain the following:

(a) The name and address of the applicant if the applicant is an individual, or if the applicant is a firm, partnership, or association, the name and address of each member thereof, or if the applicant is a corporation, its name and address and the name and address of each of its officers.

(b) The name by which the clinic is to be known.

(c) The location of the clinic for which application is made.

(d) The name of the person or persons under whose management or supervision the clinic will be operated.

(e) A statement assuring that local zoning ordinances have been complied with.

(2) Each license shall be valid only for the clinic to which it is issued and shall not be subject to sale, assignment, or other transfer, voluntary or involuntary, nor shall a license be valid for any premise other than for which originally issued. Each license shall be returned to the licensing agency immediately upon change in ownership or classification, suspension, revocation or voluntary cessation of operations.

(3) Representatives of the licensing agency shall have the right to enter upon the

premises of any facility licensed, or applying for license, pursuant to this Chapter, at any reasonable time in order to determine the state of compliance with the provisions of Chapter 390, Florida Statutes, and these rules, providing that such entry and inspection shall be made with the least possible disruption to clinic activities and in a manner considerate of the privacy and confidentiality of any patient who is present therein.

(4) When the facility is in compliance with rules, an annual license will be issued by the licensing agency. This license shall be displayed in a conspicuous place.

(5) The license issued to any facility may be suspended or revoked and an application may be denied by the Department in any case where the licensing agency finds there has been substantial failure to comply with provisions of Chapter 390, Florida Statutes, or any rules of the licensing agency. A fine as provided for in Chapter 390.18 F.S. may be imposed in lieu of suspension or revocation of license.

(6) Unless sooner suspended or revoked, a license shall expire one (1) year from the date of issuance. Sixty (60) days prior to the expiration date, an application for license renewal shall be submitted to the Department on forms furnished for that purpose.

(7) Fees will accompany the application and shall be $1.00 times the patient recovery room capacity of the clinic; provided the fee shall not be less than $35.00 nor more than $75.00.

(8) Counties and municipalities applying for abortion clinic licenses shall be exempt from payment of the licensing fees.

Specific Authority: § 390.012(1) F.S.

Law Implemented: § 390.014, 390.015, 390.016, 390.017, 390.018 and 390.019 F.S.

History: New 12/1/80

**10D–72.11 Medical Services.**

(1) There must be a written protocol for life-threatening emergencies which assures a continuum of medical services for the patient and it shall be available for review by the licensing agency. This protocol shall include provision, when circumstances warrant, for the emergency transfer of patients to a hospital which has an emergency room operating twenty-four (24) hours a day, as well as for appropriate emergency transportation to the hospital.

(2) Provision shall be made for a 24 hour a day telephone contact point to report post-operative complications which may arise subsequent to discharge.

(3) As a minimum, each clinic shall have the following equipment and facilities available:

(a) Sufficient intravenous plasma volume expanders and infusion equipment to provide for on-site therapy in case of hemorrhage.

(b) Sufficient equipment for proper patient care according to the types of patients served and the types of services rendered, including provision for the management of emergencies, in the best medical judgement of the responsible physician.

(c) A sink within or adjacent to the operating room for use by physicians and nurses for preoperative scrub.

(d) Toilet facilities sufficient to serve the needs of staff and patients.

(4) Each abortion clinic shall provide written instructions, as a guide to patients, detailing appropriate post-operative care.

(5) Each abortion clinic shall have a written health care plan for medical care and treatment of post-operative patients, including minimum time requirements for retaining the patient in recovery status.

Specific Authority: § 390.012(1) F.S.

Law Implemented: § 390.012(1) F.S.

History: New 12/1/80

**10D–72.12 Abortion Clinic Staff.**

(1) Abortions shall be performed by a qualified physician.

(2) Abortion clinics shall assure, as a minimum, that one nurse shall be present in the facility while abortions are being performed and shall be in attendance while patients are in the recovery area.

(3) Such additional personnel as may be required to provide services consistent with good medical practice shall be employed.

Specific Authority: § 390.012(1) F.S.

Law Implemented: § 390.012(1) F.S.

History: New 12/1/80

10D–72.13 Medical Records.

(1) A medical record shall be maintained on each patient accepted for an abortion and kept for at least two (2) years. This record shall include a written informed consent.

(2) The medical record shall contain the original of the following: a patient identification sheet to include at least the name, address and date of birth; physical examination; past and current obstetrical history and diagnoses; and all pertinent clinical information including surgical procedures performed, complications, medications, treatment administered, progress notes, and conditions on discharge.

(3) All patient records shall be confidential and shall not be released except by written consent of the patient. However, the clinic may release statistical information upon request by the Department of Health and Rehabilitative Services from the clinic's records after patient names have been deleted.

Specific Authority: § 390.012(1) F.S.

Law Implemented: § 390.002 F.S.

History: New 12/1/80

10D–72.14 Laboratory Services and Facilities.

(1) In all abortion clinics, laboratory services shall be provided preoperatively to each patient in accordance with standard medical practice. A standard urine test for pregnancy shall be required except when a positive diagnosis of pregnancy has been documented by other means. An hematocrit and hemoglobin determination and a test for Rh factor must be performed in all cases.

(2) $Rh_u(D)$ Immune Globulin (Human) shall be offered, within 72 hours after the abortion, to all patients who are $Rh_o(D)$ negative and $D^u$ negative, provided they have not been previously sensitized. This requirement may be waived if the patient refuses this service and in such cases an informed consent form shall be signed by those patients who reject such preventive therapy.

Specific Authority: § 390.012(1) F.S.

Law Implemented: § 390.012(1) F.S.

History: New 12/1/80

10D–72.15 Sanitation, Housekeeping and Maintenance. Each abortion clinic shall establish procedures which will minimize the opportunity for the transmission of infectious diseases and shall maintain the environment, furniture, surfaces, equipment, and supplies in clean and safe condition and in good repair.

Specific Authority: § 390.012(1) F.S.

Law Implemented: § 390.012(1) F.S.

History: New 12/1/80

10D–72.16 Disposal of Fetal Remains. All fetal remains shall be disposed of in a sanitary, nuisance free manner. Incineration or burial of such remains, as well as other nuisance free methods, are acceptable so long as the licensing agency is assured that the disposal method utilized is nuisance free.

Specific Authority: § 390.001(7) F.S.

Law Implemented: § 390.001(7) F.S.

History: New 12/1/80

10D–72.17 Effective Date of Compliance. Any abortion clinic which is in operation at the time of adoption of this rule shall be permitted a period of 90 days within which to comply with these rules.

Specific Authority: § 390.012(1) F.S.

Law Implemented: § 390.013 F.S.

History: New 12/1/80

**1064**

**STATE OF FLORIDA
DEPARTMENT OF HEALTH AND REHA-
BILITATIVE SERVICES**

OFFICE OF LICENSURE AND CERTIFICATION

---

Name of Clinic

---

Street Address/P.O. Box          Zip

---

City                    County

---

Telephone No.

---

Name of Clinic Owner

---

Address/P.O. Box                 Zip

---

City                    State

---

Telephone No.

(Licensure use only)

TO:  Office of Licensure and Certification       Receipt No.
     P.O. Box 210                                License No.
     Jacksonville Florida 32231
                                                 Approved

SUBJECT:  Application for _____ licensure.
                          year

Under the authority of Chapter 390 Florida Statutes, and Chapter 10D–72 of the Florida Administrative Code, application is hereby made to operate an abortion clinic

If application is for change of operational ownership give effective date of change.

A check in the amount of $          license fee is attached.*

---

## I.  GENERAL INFORMATION CONCERNING THE CLINIC

---

1. (a) If the ownership is a firm, partnership or association, name and address of every member.  Attach extra sheets it required.

_____
_____
_____
_____
_____

(b) If the ownership is a corporation, give the name and address of

President _____
Vice President _____
Secretary _____
Treasurer _____

* Note:  Instructions for preparation of this application are on the last page.  Please read.
**HRS FORM 1097, Mar 79**

## II. AFFIDAVIT

I, _____, hereby swear (or affirm) that the statements in this application are true and correct, and that the local zoning ordinances have been complied with.

Subscribed and sworn to before me this _____ day of _____, 19___

_____
Notary Public

_____
Signature of Chief Executive Officer

## INSTRUCTIONS FOR PREPARATION OF LICENSURE APPLICATION FORM

LICENSE FEE: The statutory license fee of $1 times the authorized patient capacity of the clinic, minimum $35, Maximum $75.

II. GENERAL INFORMATION: Data required must be completed and information called for must be provided.

HRS FORM 1097, Mar 79